## Mary Keeney

### v.

### Theresa Henning et al.

[Submitted November 17th, 1902.  Decided December 1st, 1902. Filed January 26th, 1903.]

1. Where the relation of guardian and ward exists between a mother and her infant children, commissions will be allowed her on rents collected from realty belonging to the father's estate, and of which they all were tenants in common, though the guardian did not fully perform her duties in regard to keeping accounts, and made some claims against her wards which were not entirely sustained.

2. A mother who is also guardian of her daughter, and with whom the daughter resides, is not entitled to credits, when accounting as guardian, for a confirmation outfit furnished the daughter, and the expense of a wedding feast given her.

3. In a suit by a ward against her guardian, who was also her mother, for an accounting, evidence examined and—Held, to show that the ward fully compensated the guardian for the expenses of her support, by turning over to the guardian her earnings, and that nothing should be allowed the guardian on that account.

4. Orphans Court act, section 97 (Rev. of 1877 p. 773; Gen. Stat. p. 2377), provides that a guardian shall exhibit to the orphans court annual accounts of all moneys, goods and chattels he "shall receive," and all the rents and profits of any realty in his possession belonging to the ward.

Keeney *v.* Henning.

Section 107 (*Rev. of 1877 p. 775; Gen. Stat. p. 2379*) provides that the accounts so filed shall be examined by the court, and, being found to be correct, "and the articles thereof to be supported and justified by the vouchers," shall be confirmed and entered of record, &c., and, if any article be at any time afterwards excepted to by the ward, the burden shall be on him to impeach it, &c.—*Held,* that the jurisdiction of the orphans court was confined to receipts, and such actual disbursements as were made in cash, and did not include charges by a guardian for the support of her ward, who was also her child, furnished by herself, and hence the account of such a guardian, passed by the orphans court, was not *prima facie* evidence of its correctness in such particulars.

5. The weight and strength of the presumption arising under the statute in favor of the guardian's account, passed by the orphans court, will depend upon the fairness and propriety of the items of the account itself.

6. A mother, who is also the guardian of her infant child in arms, is not entitled to credits for the motherly services rendered to it, but is entitled only to her actual outlays in money.

On exceptions to master's report.

This matter is a continuation of that reported in *13 Dick. Ch. Rep. 74,* where will be found a full statement of the case, and is heard on exceptions to a master's report made pursuant to an order of reference, as directed by the opinion there reported.

The reference was made to the late Master Romaine, who took considerable testimony in addition to that produced before the court on the previous hearing, but made no report. After his death the case was referred to Master Taylor, with directions to use all the evidence, including that taken on the original hearing, as well as that produced before Master Romaine; and he has made a report showing a balance of rents due the complainant and also the defendant George Henning.

The accounting with George seems to have been taken by consent. He was an infant when the bill was filed, but shortly after became of age, and appeared by a solicitor and counsel as an actor against the defendant, his mother, Theresa Henning.

No exceptions were taken by either party to the account of the rents and profits received and disbursements made thereout on general account. That account shows a balance due to the complainant and George Henning, severally, of $1,579.75, subject

to charges which apply to the complainant and the defendant, George, individually.

Of the matters submitted to him the master declined to pass upon the question of commissions to the defendant Theresa for collecting the rents, and also that of the allowance of a counsel fee to her for preparing her account.

On the hearing of these exceptions it was agreed by all parties that a counsel fee of $100 should be allowed for that purpose and credited to the accountant upon her general account, and, of course, divided between the complainant and George Henning.

Before the master a claim was made by the accountant against both the complainant and the defendant George for support and maintenance during the period accruing after March 17th, 1881. This claim was wholly disallowed by the master as to the complainant, and allowed as to the defendant George to an extent not satisfactory to the accountant.

The accountant also made a claim against the complainant for an allowance of $25 for the expense of a clothing outfit for her religious confirmation in June, 1878, just before she became thirteen years old; also for an allowance of $177.57 for the expense of a wedding feast given to the complainant. Both were disallowed by him.

The master refused to consider the question whether the defendant Theresa was entitled, as against the complainant and the defendant George, severally, to a credit for the amount found due her—$404.94—or any part thereof, upon an accounting by her to the orphans court up to and including March 16th, 1881.

When the vice-chancellor came to consider the exceptions he determined to give Mrs. Henning a further opportunity to support the items of $500 charged against the complainant and the defendant George in her accounting as guardian in the orphans court, and evidence was produced by Mrs. Henning in open court on November 17th, 1902, at Jersey City.

For all these refusals of the master, and to the amount allowed for support and maintenance for the defendant George, the accountant excepts.

*Mr. Charles L. Corbin,* for the exceptant.

*Mr. Robert S. Hudspeth,* for the complainant.

*Mr. John F. Marion,* for the defendant George Henning.

PITNEY, V. C.

1. The question of allowance of commissions to the defendant Theresa for collecting the rents and taking care of the property was not much discussed. She paid no commissions to anyone, but did all the work herself personally. She was the co-tenant of the complainant and the defendant George, and during the latter part of the period covered by the accounting, became the owner by purchase from her other children of all the shares except the two just mentioned.

If the relation of guardian and ward did not here exist, it is probable that under the circumstances no commissions would be allowed to the accountant. But the relation of guardian and ward did exist for the whole period as to George, and for a part of the period as to the complainant. And although the defendant Theresa did not fully perform her duties as a guardian by keeping an account with the complainant and the defendant George and duly crediting them with their shares of the rents, &c., and has made claims against them which have not been entirely sustained, yet, under the circumstances, I think that justice requires that she be allowed a fair compensation. The amount of rents actually collected for each during the period covered by the accounting was $1,853.01, and I fix five per cent., or $92.65, as a proper allowance to her against each.

2. I concur with the conclusions of the master as to the charges against the complainant for the expense of a confirmation outfit and a wedding; and the exceptions as to those items are overruled.

3. As to the exception against the refusal of the master to allow anything for the support and maintenance of the complainant after March 16th, 1881: Evidence in addition to that adduced at the original hearing was produced before the master.

[Omitting discussion of evidence.]

This review of the evidence confirms the opinion originally expressed by me that from 1881 to 1885, the period now under consideration, the complainant fully compensated her mother for the expenses of her support, and nothing should be allowed on that account.

The next exception is as to the allowance by the master to the mother for the support and maintenance of her son George. The materials before the master from which to make up that account were meagre, but such as they were I am unable to perceive that he made any mistake in the deductions he drew from them, and must overrule the exceptions taken thereto.

This leaves for consideration the last and perhaps the most important question, and that is the effect of the accounting in the orphans court.

As stated in the previous report in *13 Dick. Ch. Rep.*, Mrs. Henning took out letters of guardianship of all her children, as to those born before the death of her husband on March 24th, 1877. She states in her evidence that she took out letters on the defendant George, who was born some months after the death of his father, about a year and a half after her husband's death.

. A copy of her final account as administratrix was produced, showing a balance in her hands of the personal estate of $1,206.01, of which two-thirds, or $804 belonged to her seven children. The original inventory and appraisement amounted to $1,712.93. The inventory shows that the estate consisted of $1,571.93, cash in bank and moneyed security; $155 of butcher shop fixtures, horse and wagon, and $46 of household furniture.

On March 23d, 1881, a little more than four years after her husband's death, she, as guardian of her seven infant children, verified an account before the surrogate, which I infer was prepared by the latter or his clerk. In a schedule she shows the amount of rents received by her from the death of her husband, March 16th, 1877, to the same date in 1881, to be $2,734, an average of $57 per month. The actual nominal rental was $60. This, of course, did not include the rental of that part of the premises occupied by herself and family. She prays allowance for expenses, taxes and the payment of principal and interest

on two mortgages aggregating $1,100, without the interest, amounting in all to $2,633.48, leaving a balance of $100.52, but, after deducting her dower, leaving a balance of $67.02 to be divided among seven children—$9.57 each. In another schedule she credits the seven infants with their share of the balance in her hands as administratrix—$804—charges surrogate's fees, commissions on this $804 (a double commission), and on two-thirds of the rents received, amounting in all for commissions to $135.04, and thereby reduces the $804 to $598.46, which, divided among the seven heirs, gave to each $85.49. Then she, or the surrogate for her, makes up an individual account with each infant, precisely the same with the oldest child as with the youngest, who was born several months after her husband's death. That account is as follows: Credits the infant with $85.49, the share in the personalty, and $9.57 share of rents, making $95.06, and then prays allowance as follows: "She prays allowance, paid board, clothing and schooling of minor from March 16th, 1877, to March 16th, 1881, four years, at $125 per year, $500," leaving a balance due the guardian of $404.94.

This account was presented by the surrogate to the orphans court and passed by that court. Mary Henning swears that she never had any notice of it until after she brought this suit, and of course the infant, George Henning, who was less than four years old, could have had no notice of it. No proof was offered that any citations were issued and served on anybody, although charges for them appear in the account.

This accounting was clearly made under the ninety-seventh section of the Orphans Court act (*Rev. of 1877 p. 773; Gen. Stat. p. 2377*), and the allowance of the account was under section 107 of the same act (*Rev. of 1877 p. 775; Gen. Stat. p. 2379*).

The exceptant contends that this account so allowed is *prima facie* evidence of its correctness, as well as regards the charges against the accountant and the credit of $500 to her.

The force and effect of the decree must depend upon the proper construction of the sections of the act just mentioned. Section 97 provides that

"Every testamentary guardian or other guardian shall exhibit to the orphans court once in each year, and oftener if required, an account of all moneys, goods and chattels he *shall receive,* and of the rents, issues and profits of any real estate in his possession belonging to his ward."

It will be observed that this language does not include any payments or disbursements or services by the guardian. But by referring to section 107 it seems quite plain, and justice requires, that the guardian shall, at the same time that he charges himself with income, have the privilege of inserting in his account the items of payments and disbursements thereout.

That section (107) provides that the account so filed

"shall be examined by the court, and being found to be properly and fairly stated, *and the articles thereof to be supported and justified by the vouchers,* and the report in case of a reference being approved and confirmed by the court, shall, with such confirmation, be entered of record; and if any article of such accounts be at any time afterwards excepted to by the ward or his representative, it shall be incumbent on him to prove or show the falsity or injustice thereof, unless notice on his behalf shall have been given," &c.

And see the language of Chancellor Runyon, commenting on these sections, in *Davis* v. *Combs, 11 Stew. Eq. 473* (at *p. 481,* near the top).

Now, the first and principal question is whether it is within the province of the orphans court, on an annual accounting by a guardian, to deal with such items as are here in question, namely, services and support furnished directly by the guardian to the infant, or whether the court is not confined in its jurisdiction to the dealing simply with receipts and *actual disbursements in cash.*

I am of the opinion that the latter is the true construction of the act.

It will be observed, as before remarked, that the original section (97) providing for the filing of these annual accounts does not provide for anything but an account of moneys actually received. Then, when we look at section 107, it seems that the language "and the articles thereof to be supported and justified by the vouchers" contemplates the production of receipts for

moneys paid, and for nothing else; and that seems to me to exclude the idea that the personal services or personal claims of the guardian can be intended.

No contention was made, and there is no room to contend, that any voucher was produced to the surrogate or the orphans court by the accountant for the $500 which she charged for the support of her child during that period; nor was any produced for money paid for schooling and clothing of the ward.

Against this view the counsel for the accountant relied upon the cases of *Davis* v. *Combs, 11 Slew. Eq. 473,* and *Pyatt* v. *Pyatt, 1 Dick. Ch. Rep. 285.*

In *Davis* v. *Combs* the annual accounts included only receipts and actual disbursements, which it is fair to infer were stated in detail by items and were supported by vouchers. Part of those disbursements, which formed the subject of the appeal, was paid to a third party for the board and maintenance of the ward. This appears by what was said by the chancellor at the bottom of *p. 481* and *p. 482.* There is nothing in the case to show that there was a claim for allowance for board and support furnished by the guardian himself. And on a final accounting in the orphans court, after the ward had attained majority, the question was as to the *prima facie* effect of the decrees on the annual accountings. The ward had an opportunity to go into and did contest such items as she chose. The general nature of the case was stated by the chancellor (at *p. 479*) thus: "It is to be remembered that in the proceedings in the orphans court the annual accounts are not settled; they are merely ordered to be recorded, if, on examination, they prove satisfactory in the particulars and to the extent stated in the statute. They are still open to attack after they have been recorded. And in the case in hand the ward might have examined the guardian as to every item of the accounts, from the beginning to the end, had she seen fit, and she might have examined his vouchers with a view to showing errors in the accounts, and had she been successful in showing error, she would have had the benefit of it. She did show errors to her prejudice to the amount of $946.50, and they were corrected. The effect of

the order to record the accounts is merely to shift the burden of proof as to any items not objected to and which appear to the court to be correct." But the case shows that she did not, in the court below, attack the items in question, namely, charges for cash paid for board and clothing. It was held by the chancellor that the approval of the orphans court was *prima facie* proof of their correctness and propriety. But he, nevertheless, considered the amount and propriety of the charges, and held them reasonable.

That conclusion was affirmed by the court of errors and appeals upon the opinion of the chancellor.

The distinction between that case and this is that the dispute there was over itemized charges, supported by vouchers, for moneys paid to third parties, while here there is a single lump charge for support and maintenance, by the guardian herself, unsupported by a single voucher, and so far as it contained a charge for moneys paid, it is undistinguished from the general charge. Hence the case is not an authority for the position taken by counsel for the accountant here, namely, that the orphans court accounting in this case is *prima facie* correct in the items in question, and that the burden is on the ward to show its incorrectness.

The case of *Pyatt* v. *Pyatt* was that of an accounting by a guardian, upon citation, to a ward years after the ward became of age, and is authority for the position that on such an accounting, made at the instance of the ward after the latter had attained her majority, the guardian was entitled to a credit for the support and maintenance of her ward, and that the orphans court had jurisdiction to determine the amount thereof. That, of course, is no authority for the position taken in this case by counsel for the accountant.

But if it be conceded that the presumption must be in favor of the propriety and fairness of the charge in question, passed upon by the orphans court, and that the burden is on the ward to overcome it, yet the strength and weight of that presumption must depend upon the fairness and propriety of the charge itself, as set out in the account. Further consideration leads me to

the conclusion that the criticism I made upon it in *13 Dick. Ch. Rep.* *79,* near bottom, is none too severe.. An examination of the account shows that the gross receipts for rent during the four years covered by the account were $2,734; that the expenses of repairs, taxes and insurance amounted to $1,368.98, which, deducted from $2,734, leaves a net income of $1,365.02. An examination of the accounting of the personal estate shows that the administratrix could not have received more than $1,700 in cash, and that she paid out of that in cash about $450, leaving a net balance of $1,250, which is just about the amount of principal and interest paid on the mortgages on the real estate. Hence it appears that with a net income for the four years of $1,365, and, as she swears, no estate of her own, and little or no profits from her shop, she was able to support and maintain her seven children, with what little assistance she got from the two older ones. This shows very clearly that she never expended $125 a year on each of those seven children, or any such sum; and, as held in my previous opinion, she is not entitled to a profit out of her children. To give credit to such a result, we must conclude that out of a net income of $1,365 for four years—$341 a year—besides the free use of a part of their real estate, she could support her family of seven children and bring them in debt to her in the aggregate sum of over $2,800.

To prevent any possible injustice to the accountant in the premises, on November 17th I heard further evidence from her in support of these charges in her orphans court accounting. On that occasion she produced seven little pass-books, in which she said she had kept an account of the expenses incurred for each of her children for a year or two after the death of her husband. Each was endorsed in her handwriting, with the name of the particular child with whom the account was kept. No date whatever appears in either of them. She said that they had been in the hands of her counsel from the time this suit was instituted, but that counsel did not see fit to produce them, either on the first hearing or before the master. This fact, in connection with the first glance at the contents of the books, produced a feeling of suspicion of them, but a further careful examination satisfied me that they were genuine.

The account against Mary, the complainant, amounts to $125.22, and consists mainly of clothing, but in it are included two items: "Other expenses, $8," and "School money, $7," which latter items corresponds with the amount which Mrs. Henning swore that she paid for Mary's schooling at the Catholic parish school after her husband's death; and there is a charge for a white dress, which probably covers the charge for a suit of clothes for her confirmation.

The book account with George commences with what is plainly the cost of his first infant clothing, and goes on until he was large enough to wear shoes, a hat and a kilt suit. I find ten separate charges for shoes, at prices which indicate that the boy was old enough to walk. I find three charges for hats. The total is $39.50. I think it fair to conclude that this covers the period until he was four years old.

The accountant also produced some vouchers for clothing purchased from 1879 to 1881, mainly in 1881, most of which I infer were for men's or boys' clothing, the total amounting to $86.40. One bill of $5.56, in June, 1878, was especially for Mary and Amelia jointly. She also produced physicians' bills for medical attendance, amounting to less than $100. The evidence tended to show that very little of this was properly chargeable to the complainant or to the defendant George.

The evidence so produced furnishes little aid towards an accurate conclusion.

In a case like this it is of course impossible to arrive at any accurate result. But in the case of the complainant, taking into consideration the fact that of the four years covered by the account in question she was either working out or in the house assisting her mother, and earning, or nearly earning, her living for nearly two years, I think that $250 instead of $500 will be a liberal allowance. The account must be reduced accordingly —that is, that she became indebted to her mother during that time in $154.94. The result is that she must be charged, against the balance found in her favor by the master, with three items, viz., $50, being one-half the counsel fee; $92.65 for commissions, and $154.94 for board and support, in all, $297.59, leaving a balance due her from her mother of $1,282.16.

Keeney *v.* Henning.

The master has not charged the accountant with interest on the annual receipts of rents. The question of interest does not seem to have been raised before him. The bill was filed January 31st, 1898. The account of the rents is brought down by a supplement to June 1st, 1902. No exception is filed by either the complainant or the defendant George on that account.

With regard to the account of George Henning in the orphans court, I am unable to find that the mother actually expended as much as $500 in his nurture for the three years and three-quarters that he lived during that period. I think it unnecessary to adduce argument or authority for the position that in such a case a mother is not entitled to pecuniary compensation for the motherly services which she renders to an infant child in arms, but is entitled only to the actual outlay in money. As in the case of the complainant, so in the case of the defendant George, little evidence was adduced to show what the actual cost of the support was. The whole matter is submitted to the court as a juryman to act upon common knowledge of such affairs. I think $200 will cover the whole expense during that period, and that amount must be charged to him, in addition to those items already mentioned. The account with him will stand as follows:

| | | |
|---|---:|---:|
| Net rents .................................... | | $1,579 75 |
| Charges by master................ | $1,068 00 | |
| Half of counsel fee............... | 50 00 | |
| Commissions ..................... | 92 65 | |
| Board, &c., before 1881............ | 104 94 | |
| | | 1,315 59 |
| Due George........................... | | $264 16 |

To each of these accounts must be added interest from June 1st, 1902.

At the hearing on November 17th, the complainant, when asked about her age, made a clear mistake of one year, making herself one year younger than she actually was. A careful examination of the evidence shows that she was born on August 5th, 1865, that she was married in August, 1885, when she was just past twenty years of age.